## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01439-PAB-NRN

JASON ALAN CAPPELLI, and
VINCENT C. TODD,

                              Plaintiffs,

v.

WILLIAM HOOVER, a Sergeant, Lakewood Police Department,
JIMMY TORSAK, a Detective, Lakewood Police Department,
MICHAEL GRIFFITH, an Agent, Lakewood Police Department,
JANNA SCHMMELS, an Agent, Lakewood Police Department, and,
JOHN DOE, an unidentified Agent of the Bureau of Alcohol Tobacco and Firearms.
                              Defendants.

## REVISED SECOND AMENDED COMPLAINT PURSUANT TO THE COURT'S ORDER [DOCUMENT 58]

Jason Alan CAPPELLI, by and through Counsel, Nancy C. Johnson, and

Vincent C. Todd, *pro se*, submit their SECOND AMENDED AND SUPPLEMENTAL

COMPLAINT against the named Defendants herein as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, JASON ALAN CAPPELLI, is a natural person and a resident of

Jefferson County, with a post office address of 12608 West 1st Place, Lakewood,

Colorado 80228.

2.     Plaintiff, VINCENT C. TODD, is a natural person and a resident of Jefferson County, with a post office address of 12608 West 1st Place, Lakewood, Colorado 80228. In May of 1985, CAPPELLI was the subject of a petition in Dependency and Neglect in Denver Juvenile Court, under which he was eventually placed in special foster care with Plaintiff TODD; in permanency planning, TODD was made CAPPELLI's legal guardian. From 1987, CAPPELLI has been a member of TODD's household under a psychological bond, which Colorado recognizes as a family unit. DOC AR 300-1(III)(l), specifically recognizes the status of having been an offender's guardian as establishing the status of "Immediate Family Member."

3.     Defendant WILLIAM HOOVER, is a Sergeant, Lakewood Police Department, with a principal address of 445 South Alison Parkway, Lakewood, Colorado 80226. Said Defendant, at all times complained of herein acted, under color of state law, even when such Defendant's actions were in violation of the Constitution and Laws of the United States and/or the Constitution and Laws of the State of Colorado. The Claims herein are brought against said Defendant individually.

4.     Defendant JIMMY TORSAK, is a Detective, Lakewood Police Department, with a principal address of 445 South Alison Parkway, Lakewood,

Colorado 80226. Said Defendant, at all times complained of herein acted, under color of state law, even when such Defendant's actions were in violation of the Constitution and Laws of the United States and/or the Constitution and Laws of the State of Colorado. The Claims herein are brought against said Defendant individually. This Defendant is named based upon police reports as provided by the City of Lakewood under the Colorado Criminal Justice Records Act, and the production is incomplete as records have been withheld or redacted. From the records produced, it is believed that the individual seen in security camera (SkyBell HD™) footage from 12608 West 1st Place on April 19, 2017, (Attached as Exhibit 1 to the Complaint) is JIMMY TORSAK, but the City of Lakewood has been unwilling to confirm or deny that identification prior to the filing and service of the Complaint. Certain actions of this Defendant, as set forth in this Complaint, are based upon Plaintiffs' conclusions that TORSAK is correctly identified as the individual pictured in Exhibit 1 as filed with the original Complaint [document 001-01] herein, which is incorporated herein by reference.

5.      Defendant MICHAEL GRIFFITH, is an Agent, Lakewood Police Department, with a principal address of 445 South Alison Parkway, Lakewood, Colorado 80226. Said Defendant, at all times complained of herein acted, under color of state law, even when such Defendant's actions were in violation of the

Constitution and Laws of the United States and/or the Constitution and Laws of the State of Colorado. The Claims herein are brought against said Defendant individually.

6.     Defendant JANNA SCHMMELS, is an Agent, Lakewood Police Department, with a principal address of 445 South Alison Parkway, Lakewood, Colorado 80226. Said Defendant, at all times complained of herein acted, under color of state law, even when such Defendant's actions were in violation of the Constitution and Laws of the United States and/or the Constitution and Laws of the State of Colorado. The Claims herein are brought against said Defendant individually as a *Bivens* claim.

7.     Defendant JOHN DOE, is an unidentified Agent of the Bureau of Alcohol Tobacco and Firearms, with a principal address of 950 17th Street, Suite 1800, Denver, Colorado 80202. Said Defendant, even though a federal officer, at all times complained of herein acted, under color of state law, even when such Defendant's actions were in violation of the Constitution and Laws of the United States and/or the Constitution and Laws of the State of Colorado. The Claims herein are brought against said Defendant individually. This Defendant is shown in security camera (SkyBell HD™) footage from 12608 West 1st Place on April 19, 2017, (Attached as Exhibit 2 to the Complaint [Document 001-02]). Both

Defendant STEGNER and the City of Lakewood have been unwilling to identify the individual prior to the filing and service of the Second Amended and Supplemental Complaint.

8.       Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331, 1332, 1343(a)(3) and 1367. Venue of this action is proper under 28 U.S.C. § 1391(b).

## GENERAL FACTUAL AVERMENTS

9.       On February 10 of 2000, Plaintiff JASON CAPPELLI prevailed by jury verdict in an action for violations of his civil rights against two Lakewood Police Department agents and the City of Lakewood in United States District Court of the District of Colorado case number 97-D-1914. Following this verdict, the City of Lakewood, in United States District Court of the District of Colorado case number 99-D-2092, on behalf of Benjamin Michael Monn, was found liable in 97-D-1914, settled a second case related to the violation of JASON CAPPELLI's Fourth Amendment rights committed by Monn on October 28, 1997, which was between the time Monn had been notified under Rule 4(d), FEDERAL RULES OF CIVIL PROCEDURE, of his status as a defendant in 97-D-1914 and the answer filed on his behalf in 97-D-1914.

10.       The culture within the Lakewood Police Department under Chief DAN MCCASKY is such that Monn is memorialized by the Lakewood Police Department

by the naming of an annual award for "Mike Monn." In the May 25, 2017, Lakewood Police Awards presentation, Division Chief Steve Rickles said of Monn, "I can tell you for those who know Mike Monn, or knew Mike Monn, Mike was an incredible police officer at this agency and to be mentioned in a sentence with Mike is a true honor."

11.    The Lakewood Police Department maintains an institutional bias against Cappelli, as documented, in part, in the judgment in 97-D-1914, and the pleadings in the settled case, 99-D-2092. In the incidents with CAPPELLI in the 1990s, a Lakewood Police Department BOLO (be on the lookout) described Cappelli as dangerous because "his attorney is spring loaded to sue the Department." The attorney referred to in the BOLO was Plaintiff TODD. The institutional bias went so far as to include:

A. Towing CAPPELLI's legally parked, but broken down car, and refusing a due process hearing on the taking. (Lakewood refunded the towing and impound charges immediately before the threatened deadline CAPPELLI had provided for commencing suit.)

B. Refusing to forthwith return a snow tube unlawfully seized by Mike Monn in his unlawful arrest of CAPPELLI on October 28, 1997, when presented

with a court order, bearing the seal of the Jefferson County Combined Courts, until TODD informed then Chief Johnson's legal advisor, Janet Young, that if the snow tube was not immediately produced in compliance with the Court order, he would seek a citation for criminal contempt and a jail sentence against Chief Johnson.

C. Directing a Lakewood Police Detective who Chief Johnson had determined to have illegally seized and destroyed property with a value of $100.00 belonging to JASON CAPPELLI not to compensate CAPPELLI for the $100.00 loss; necessitating the jury trial in 97-D-1914.

12.   In connection with JASON CAPPELLI's parole planning, on April 16, 2015, TODD advised the Department of Corrections, through Cappelli's case manager, Nichole Carpenter,

> Jason is welcome to return home and has a support system here. There are some issues that will need to be worked out with parole because most of the information I work with out of my home office involves privileged communications. That would create some issues with respect to the scope of consent for parole searches of parts of the residence.

13.   On December 22, 2015, Plaintiff JASON CAPPELLI was released to mandatory parole on his mandatory release date by the Colorado Department of Corrections, pursuant to a parole plan approved by the Colorado Board of Parole,

to his home at 12608 West 1st Place, Lakewood, Colorado. As a part of that Parole Plan on October 21, 2015, Plaintiff VINCENT TODD, had received and executed the Parole Sponsor Advisement – AR Form 250-21B (03/10/15) for JASON CAPPELLI, executed for the Division of Adult Parole by ShawnDee Ingo, Community Parole Supervisor. CAPPELLI's initial Sentence Discharge date, upon which Parole supervision must terminate by operation of law, was December 22, 2018.

14.    Consistent with *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), in accepting his mandatory parole under Colorado law, CAPPELLI's expectation of privacy as a parolee was controlled by both Colorado statutes and the Colorado Department of Corrections Parole Administrative Regulations (ARs). The statutes and the ARs are published and publically available such that the extent of the diminished expectation of privacy upon which *Samson v. California, supra*, is based is readily determinable for a Colorado parolee as well as Colorado law enforcement.

15.    The Colorado Department of Corrections Parole ARs, while requiring CAPPELLI to submit to home visits by Community Parole Officers, and, upon their request, to consent to a search of his residence, did not extend the consent to search to officers not in the employ of the Colorado Department of Corrections. Cooperation by Community Parole Officers of the Colorado Department of

Corrections with other law enforcement agencies is governed by Department of Corrections AR 250-17, COOPERATION WITH LAW ENFORCEMENT AGENCIES FOR ADULT PAROLE, which does not authorize Community Parole Officers to authorize officers from other agencies to enter a parolee's residence. AR 250-32(IV)(c), requires advanced approval for a Community Parole Officer to work with local law enforcement agencies on multi-agency projects and task forces. No documents produced by the Colorado Department of Corrections in response to Colorado Criminal Justice Records Act requests made prior to commencement of this action show any such approval.

16.    From September 13, 2016, though the end of May, 2017, CAPPELLI was under terms and condition of Parole which provided in pertinent part:

> 4. Report: Parolee shall make written, and in person, reports as directed by the Community Parole Officer; and shall permit visits to his/her place of residence as required by the Community Parole Officer.
> a. Parolee further shall submit urinalysis or other tests for narcotics or chemical agents upon the request of the Community Parole Officer, and may be required to pay for all tests.
> b. Parolee further agrees to allow the Community Parole Officer to search his/her person, or his/her residence, or any premises under his/her control, or any vehicle under his/her control.

It is significant to note that neither CAPPELLI's Parole conditions, nor the Parole Administrative Regulations authorize, the search of CAPPELLI's cell phone or

personal computer without a warrant. Neither do they compel CAPPELLI to consent to such a search.

17.     On April 17, 2017, Community Parole Officer MATTHEW STEGNER, who had been CAPPELLI's supervising Community Parole Officer since June of 2016, made his first home visit to JASON ALAN CAPPELLI at 12608 West 1st Place, Lakewood, CO 80228 (hereinafter "The Residence"). In the course of this visit, STEGNER observed, and was told by CAPPELLI, that CAPPELLI's anxiety prevented him from opening the front door if he did not know who was there. This caused him to refuse to answer blocked calls to his cell phone and CAPPELLI generally would not answer the phone to an unidentified caller. When STEGNER arrived for his visit he called the home's landline phone causing CAPPELLI's parole sponsor, VINCENT TODD to answer the phone and put CAPPELLI on the line. CAPPELLI then responded to the front door and admitted STEGNER and the Community Parole Officer who accompanied him. STEGNER remained in the house for less than five minutes, and, beyond the initial interaction with VINCENT TODD when TODD answered the phone, made no attempt to interact with the parole sponsor, and directed no inquiries or concerns to VINCENT TODD.

18.   In his Colorado Web-Based Integrated Support Environment (CWISE) notes of the April 17 home visit, STEGNER noted that there was a motion detector under the eaves on the front porch, and a video doorbell and one other camera at the front door. Additionally, STEGNER noted that two of the upstairs bedrooms had digital locks, including the comment "Doors in the home have digital locks on them with keypads for unknown reason." One of the "cameras" identified in STEGNER 's notes was, in fact, not a camera, but rather a porch light. The motion detection sensor was for a obsoleted and disconnected porch light switch. In fact, no parole directive or Administrative Regulation of Department of Corrections prohibited the video camera present (A SkyBell HD™) at the front door of the residence. Furthermore, at no time prior to late October of 2017, did STEGNER, or any other Department of Corrections official, make any request of CAPPELLI or TODD that the video doorbell be removed.

19.   TODD had obtained Architectural Review approval from the Lakewood Hills Condominium Association on June 12, 2016, to replace the previously disabled video doorbell with a SkyBell HD™. Todd Ordered the SkyBell HD™ on June 18, 2016, and the order shipped on June 22, 2016. While the SkyBell™ HD was installed at the front door of 12608 West 1st Place, Lakewood, Colorado, and activated on November 19, 2016; CAPPELLI took no part

in its installation or maintenance, did not, and does not, have the software to access the SkyBell™ application on any of his devices, and did not, and does not, have the necessary password to access the SkyBell™ feed, even if he were to locate the software and install it on his devices. As such, the SkyBell HD™ would not have been a violation of even the Intensive Supervision Parole terms and conditions CAPPELLI was subject to until June of 2016.

20.    On April 19, 2017, agents of the Lakewood Police Department contacted Community Parole Officer STEGNER and requested that he participate with them in an operation at The Residence. Officers had no search warrant, no probable cause, and no exigency to support entry into The Residence. Officers lacked any articulable basis under the Fourth Amendment to enter the residence without consent. STEGNER agreed with Sergeant HOOVER, Detective TORSAK, and other officers of the Lakewood Police Department, to conduct a home visit as an artifice to facilitate admitting Lakewood officers to search, without a warrant, The Residence and to arrest JASON CAPPELLI so that he could be interrogated and searched coercively.

21.    Upon information and belief, the Community Parole Officers' entry into the Residence on April 19, 2017, was at the request of and pursuant to an agreement with Lakewood Police Department Defendants. STEGNER has attempted

to conceal the basis for Lakewood Police Department involvement, while being unable to identify any of the individuals who accompanied he and PHILLIPS.

> Q And you were accompanied by a number of Lakewood officers. Is that correct?
> A Both Lakewood and an ATF liaison and Officer Phillips.
> Q How many Lakewood officers?
> A Unknown.
> Q What were their names?
> A Unknown.
> Q You requested their assistance, correct?
> A Yes, we had this pre-arranged.
> Q At whose request?
> A My request, for officer safety.
> Q And there were, what, approximately ten officers?
> A As I said, I do not know.

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 15:23-16:11). Neither Detective TORSAK nor the ATF liaison would have had any reason to be present if the operation was only to provide an "officer safety" assist. Indeed, if the concern was for "officer safety," the appropriate response would have been to request, by phone, CAPPELLI to meet STEGNER on the driveway in front of the residence where he could have been asked for consent to search and a revocation filed if he declined to give his consent).

22.   While, ultimately, Detective TORSAK[1] disclosed that officers were investigating "a fire on Green Mountain," the sworn testimony of MATTHEW JAMES STEGNER on May 17, 2017, was that he was in contact with Lakewood Police Department officers to coordinate, for officer safety, the "home visit" starting at 1 PM on April 19, 2017. Online posts of the West Metro Fire Protection District indicate that the first alarm on the fire the Lakewood officers were supposedly investigating was not turned in until between 1:30 p.m. and 1:48 p.m. that day.

23.   With respect to a search of The Residence, VINCENT TODD's Parole Sponsor Agreement (AR 250-21B) required the supervising Community Parole Officer to request TODD's consent to search the residence, stating:

> I will allow Community Parole Officers to visit my residence at any time. I will also consent to Community Parole Officers searching my residence upon request based on the parole agreement or ISP order.

No such request was made, MATTHEW JAMES STEGNER confirmed under oath at hearing on May 17, 2017, that no consent was requested or given:

> Q You did not ask permission to search. Is that correct?

---

[1]   The Lakewood Police Department has refused to confirm that Jimmy Torsak is the individual pictured in the SkyBell™ video frame that is attached as Exhibit 1. Attempts through other sources to confirm or exclude Torsak as the individual shown in Exhibit 1 have not been productive. The Complaint is pleaded upon information and belief that Exhibit 1 is a photograph of Defendant Jimmy Torsak.

A  We don't need to ask for permission, due to the sponsor agreement that was signed by Mr. Todd.

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 23:14-17).

24.   At approximately 4:35 PM, April 19, 2017, Community Parole Officers MATTHEW JAMES STEGNER and SHEFALI PHILLIPS, armed and outfitted in bulletproof vests, approached the front door of The Residence. The Community Parole Officers drew their guns and rang the video doorbell, then CPO SHEFALI PHILLIPS covered the video doorbell's lense and the officers pounded on the front door without announcing or identifying themselves as parole officers. The violent pounding on the front door caused Plaintiff CAPPELLI to panic at the thought of home invaders and flee and hide in the basement of The Residence. The activation of the doorbell caused Plaintiff TODD, working in his office in back of the residence on the top floor, to activate the SkyBell™ software on his iPad. Because the Community Parole Officers were covering the lense, Todd could not determine the identity of the individuals who had pressed the doorbell.

25.   The Community Parole Officers proceeded to ring the doorbell a second time and again cover the camera lense then again pound on the front door.

SkyBell HD™ footage shows that TODD opened the front door approximately 80 seconds after the initial button press.

26.    Upon opening the front door, TODD was confronted with the two armed parole officers who immediately ordered him to step back through the residence and isolated him on the couch in his living room. Following quickly behind the two Community Parole Officers were a string of armed Lakewood Police officers and one individual wearing a raid jacket with both "Police" and "ATF" emblazoned on it, entering without regard to the fact that they had no lawful basis to enter the residence.

27.    With TODD isolated, and monitored, on the couch in his living room, STEGNER proceeded upstairs to the second floor. The door to the master bedroom was secured by a digital lock causing MATTHEW JAMES STEGNER to call out to TODD, demanding that he provide the entry code. TODD responded that if MATTHEW JAMES STEGNER would bring him his iPad, which was on his desk in his office[2], Todd would open the lock. STEGNER, without lawful authority, directed TODD that if he did not immediately provide the digital code MATTHEW JAMES STEGNER would break down the door. Only then did TODD provide STEGNER with

---

[2]    The office was left unlocked and open when Todd scrambled to open the front door in response to the Community Parole Officers' pounding.

the entry code to the master bedroom. Apparently, upon entering, MATTHEW JAMES STEGNER left the master bedroom door open for the remainder of the time Community Parole Officers and Lakewood Police Officers were present in The Residence on April 19, 2017.

28.     Within less than five minutes of the Community Parole Officers' entry into the residence, CAPPELLI surrendered from below mattress pads in the corner of the basement. He was then handcuffed, brought upstairs and held on a recliner in the living room of the residence while MATTHEW JAMES STEGNER, Lakewood Police officers, and the individual wearing the "ATF" raid jacket, still without a warrant and without consent, searched the residence, including the previously locked master bedroom.

29.     While MATTHEW JAMES STEGNER and other Defendants were searching the residence, Detective JIMMY TORSAK began aggressively questioning CAPPELLI while he was handcuffed and sitting on the recliner in his living room. TORSAK informed CAPPELLI that they had photographs of him related to setting a fire in Green Mountain, and that "the camera doesn't lie." Defendant JIMMY TORSAK was well aware, having agreed that MATTHEW JAMES STEGNER would provide him entry into the residence, that he had no legal right to be present, and

that his actions were in violation of the Fourth Amendment to the Constitution of the United States of America.

30.   MATTHEW JAMES STEGNER returned to the living room and engaged CAPPELLI in conversation, with CAPPELLI denying that he had done anything wrong and, in a panic, pleading with MATTHEW JAMES STEGNER "Don't do this, I haven't done anything." In the course of CAPPELLI's pleading with MATTHEW JAMES STEGNER, CAPPELLI said "I didn't set any fire" at which time STEGNER triumphantly announced that if he hadn't set the fire, CAPPELLI would have no way to know why they were at the residence, as "nobody said anything about setting any fire." At that point, TODD interjected something to the effect of "Jason, just remember that police officers are permitted to lie and very often do." At this point MATTHEW JAMES STEGNER became angry with TODD and they exchanged words. TODD pointed out that JIMMY TORSAK had already said they were there because of a fire on Green Mountain. Confused and momentarily apologetic, MATTHEW JAMES STEGNER said something the effect that he hadn't been in the room and did not know that that had been said. At this point, TODD angrily pointed out that if the Lakewood Officers had any right to be present under MATTHEW JAMES STEGNER 's authority it required that he be supervising them, and he clearly was not.

31.   TODD then overheard a call, made by one of the Lakewood officers, apparently from the kitchen (immediately behind where TODD was seated in the living room), in which a Lakewood officer briefed someone who they identified by the rank of "Commander". Upon information and belief, based upon the information actually produced by the City of Lakewood, this was Commander THEODORE MCNITT the incident commander responsible for directing Lakewood Officers to enter the residence to search and to arrest CAPPELLI without a warrant. Commander MCNITT's actions were a continuation of the City of Lakewood's policy, found in 97-D-1914, to violate Cappelli's federally protected rights.

32.   At Detective JIMMY TORSAK's direction Lakewood crime scene technicians arrived, and without any consent or lawful authority and with other Lakewood Police officers, began photographing things within the residence. During this time Defendants MICHAEL GRIFFITH, and JANNA SCHMMELS, without lawful authority conducted a search of the basement of the residence, during which one or both of them caused the cables connecting the Apple X-Serve blade hosting Plaintiffs Todd's web server, e-mail server and ftp server from the internet. Said action constitutes a criminal act under § 18-9-306.5, COLORADO REVISED STATUTES 2016, making it a *per se* unreasonable act in violation of the Fourth Amendment. TODD's response to the disconnection of the server was delayed

because the Defendants did not make Plaintiff TODD aware that they had moved the server and, until Cappelli was removed, restricted his movement within The Residence resulting in the server being off line from between 5:13 p.m. and 6:46 p.m. on April 19, 2017.

33.    While The Residence was being searched and photographed, TODD and CAPPELLI had a conversation in the living Room where they were isolated. TODD reminded CAPPELLI that he had an obligation to comply with any lawful directives of the parole officer, and while he was not to physically resist, there was no lawful requirement that he consent to any search by Lakewood Police. At this point, JIMMY TORSAK rather arrogantly announced to TODD and CAPPELLI that they shouldn't worry, "We're going to do this right. We're going to have a 41.1[3], signed by a judge for everything." Although that was never done, CAPPELLI was never told by JIMMY TORSAK or any other Defendant that no such order had been issued.

34.    JIMMY TORSAK was present when MATTHEW JAMES STEGNER discussed that the stun gun was found in TODD's locked master bedroom and when CAPPELLI, while acknowledging that the stun gun was in the house, explained that he had no control over it. At that time the law on what constitutes possession of a

---

[3]    An apparent reference to Rule 41.1, COLORADO RULES OF CRIMINAL PROCEDURE, dealing with judicial orders for non-testimonial identification.

weapon was clearly established under *Henderson v. United States*, 135 S. Ct. 1780,

1784, 191 L. Ed. 2d 874, 83 USLW 4326, 15 Cal. Daily Op. Serv. 4828, 2015

Daily Journal D.A.R. 5305, 25 Fla. L. Weekly Fed. S 259, 2015 WL 2340840

(2015).

35.     Shortly after 5:05 p.m., TODD was permitted, under escort, to go up to

his home office on upper floor to pick up a mailing that he was in the process of

posting at the time police entered, then to his bedroom to change out of a workout

suit and into street clothes, and to leave The Residence to go to the Green

Mountain Post Office and return. Upon TODD's return, officers were still

questioning CAPPELLI and searching the residence. Shortly before 6:00 PM

CAPPELLI was removed from the residence in handcuffs, barefoot and shirtless.

Prior to CAPPELLI being removed, Detective JIMMY TORSAK was overheard saying

to his command (believed to have been Commander MCNITT) "Okay, so here's,

here's what we've got. Ah, he's dirty, ah, but we don't have enough evidence to

charge. So, ah Parole found a stun gun in the house." They then discussed that

parole was arresting Plaintiff CAPPELLI because of the stun gun, however, the

traffic of other officers obscured the conversation until Torsak was heard to say,

"So, so that being said, that that's the game plan unless you guys come up with

anything else. I think it's solid. I think this will take care of the problem, at

21

leastwise on GPS. Ah, then we ah hope for a … hope for some help from all the lab work."

36.    At this time it was clear to all concerned that there was no probable cause for CAPPELLI's arrest, no sufficient grounds pursuant to Rule 41.1(c), COLORADO RULES OF CRIMINAL PROCEDURE, for the issuance of any order under Rule 41.1, COLORADO RULES OF CRIMINAL PROCEDURE, and, no lawful grounds for the seizure of any property from either CAPPELLI or The Residence. Notwithstanding this fact, and consistent with the unwritten policies of the City of Lakewood, as found by, and necessary to, the judgment in 97-D-1914, the Lakewood Officers continued with the constitutionally offensive conduct.

37.    As Lakewood Officers were leaving The Residence, TODD observed them taking items of clothing.

38.    As MATTHEW JAMES STEGNER was leaving the residence he handed a DOC form DOC 300-6A (rather than the appropriate DOC form AR 250-57C) detailing that the Community Parole Officers were removing one Apple iPhone 4S and one stun gun from the residence. MATTHEW JAMES STEGNER provided TODD with the second "no carbon required" sheet of the form. At this point, TODD stated to MATTHEW JAMES STEGNER that:

A.  His actions were clearly in violation of the Constitution of the United States and criminal as Lakewood Police Department agents had just removed several items of CAPPELLI's clothing from the residence.

B. Had Lakewood Police Agents been acting under STEGNER's authority he would have known and included them in his inventory.

C.  The fact that those items were not listed on the form was proof of his criminal conspiracy with the Lakewood officers to conduct an unlawful search and seizure from within the residence.

MATTHEW JAMES STEGNER then stormed outside and consulted, in front of the garage and out of TODD's hearing, with Sgt. WILLIAM HOOVER. After that conversation both MATTHEW JAMES STEGNER and WILLIAM HOOVER reentered The Residence, without seeking permission to enter The Residence and took the NCR copy of the form from TODD, over his protest. They then exited The Residence returning after altering the form to add the notation "1 of 2" to the bottom of the form and with a second page marked "2 of 2" showing the seizure of two pairs of boots one cap and one shirt. The alteration of the form was clearly in response to TODD pointing out that the form was evidence of the unlawful and rogue actions of MATTHEW JAMES STEGNER and Lakewood officers in furtherance of their

agreement to violate CAPPELLI and TODD's rights under the Fourth Amendment to the Constitution of the United States.

39.     The stun gun that MATTHEW JAMES STEGNER found within the residence was located in the locked master bedroom, hidden and not in plain sight. Neither STEGNER nor any other Defendant had reason to believe CAPPELLI had the ability to enter the locked master bedroom, the present intention to enter the locked master bedroom, or the knowledge of exactly where within the locked master bedroom the stun gun existed.

> Q (By Ms. Johnson) But my next -- let's move on to the stun gun.
> Now, Mr. Stegner, you stated it was found under a bed, correct?
> A Yes.
> Q Now, that bed was in a locked room, correct?
> A Yes, but the door should not have been locked.[4]

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 35:17-22). Additionally, although the misinterpretation of clearly established law would have made CAPPELLI liable for a weapons violation as soon as armed Community Parole Officers entered The Residence, STEGNER made it clear what the facts, as known to himself and the officers at The Residence were at the time of arrest:

---

[4]     STEGNER at no time has provided any lawful parole directive or AR supporting his contention that "the door should not have been locked."

Q (By Ms. Johnson) Now, you -- your allegation claims that Mr. Cappelli is the one that possessed the -- a weapon. Is that correct?

A No, it is in the residence, which is a violation.

Q You said -- your allegation says "possessed a weapon," correct?

A It's how the system automates the violation when it enters the complaint. And it was in possession, due to it being in the residence.

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 18:5-13). Thus, the facts as known to MATTHEW JAMES STEGNER at the time he arrested CAPPELLI for a parole violation of possession of a weapon were insufficient as a matter of law to constitute a violation under the clearly established United States Supreme Court precedent of *Henderson v. United States*, *supra*.

40.    MATTHEW JAMES STEGNER had no probable cause to arrest JASON CAPPELLI and did so wholly for the purpose of furthering his conspiracy with Lakewood officers and fellow Community Parole Officers to violate CAPPELLI and TODD's rights under the Constitution and laws of the United States. The fact that their actions also constituted serious felonies under Colorado law did not deter their misconduct.

41.    Under Colorado law, a Community Parole Officer's authority to arrest CAPPELLI was limited by § 17-2-103(1), COLORADO REVISED STATUTES 2016, which provided,

(1) The director of the division of adult parole or any community parole officer may arrest any parolee when:

(a) He or she has a warrant commanding that such parolee be arrested; or

(b) He or she has probable cause to believe that a warrant for the parolee's arrest has been issued in this state or another state for any criminal offense or for violation of a condition of parole; or

(c) Any offense under the laws of this state has been or is being committed by the parolee in the community parole officer's presence; or

(d) He or she has probable cause to believe that a crime has been committed and that the parolee has committed such crime; or

(e) He or she has probable cause to believe that the parolee is leaving or about to leave the state; or

(f) He or she has probable cause to believe that the parolee has violated one or more conditions of parole and that the parolee will fail or refuse to appear before the board to answer charges of violations of one or more conditions of parole; or

(g) He or she has a reasonable belief that the arrest is necessary to prevent serious bodily injury to the parolee or any other person or to prevent the commission of a crime; or

(h) He or she has probable cause to believe that the parolee has committed a technical violation of parole for which the underlying behavior is not a criminal offense and the community parole officer has exhausted all appropriate or available intermediate sanctions, treatment, and support services.

Section 17-2-103(1), COLORADO REVISED STATUTES 2016. Based upon STEGNER's testimony at hearing on May 17, 2017, neither Community Parole Officers nor Lakewood Defendants had reason to believe that any of the conditions of § 17-2-103(1), COLORADO REVISED STATUTES 2016, which would authorize the arrest of a parolee existed.

42.     Although claiming that CAPPELLI was in Parole custody, and subject to being lodged by STEGNER in the Jefferson County Jail located some 4.6 driving miles to the west of The Residence, STEGNER agreed with HOOVER and TORSAK to permit them to transport CAPPELLI to the LAKEWOOD POLICE DEPARTMENT, some 3.9 driving miles east of The Residence.

43.     The Lakewood Defendants, without lawful authority, transported CAPPELLI to the Lakewood Police Department where they seized his trousers, took forensic samples from his person and photographed him. Such actions, humiliating and embarrassing CAPPELLI, were in violation of his right to privacy that is an adjunct to the Fourth Amendment to the Constitution of the United States and were done knowing that no lawful grounds existed to arrest CAPPELLI and that no Rule 41.1, COLORADO RULES OF CRIMINAL PROCEDURE, order had been sought or obtained to take samples.

44.     CAPPELLI was later transported and booked into the Jefferson County Jail on April 19, 2017, by Defendant MICHAEL GRIFFITH without any warrant or appropriate judicial or administrative finding under *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

45.     At no time did the Jefferson County Sheriff's Office receive any document amounting to an arrest warrant, information that an arrest warrant had

issued, or anything complying with *County of Riverside v. McLaughlin,* authorizing Cappelli to be held in the Custody of the Jefferson County Sheriff in connection with the April 19, 2017, arrest.

46.   CAPPELLI was not served with the documents related to a parole revocation until May 8, 2017, and MATTHEW JAMES STEGNER, and other Community Parole Officers, deliberately withheld the documents, in violation of the Colorado Criminal Justice Records Act and AR 1350-04, from DOC Headquarters. This was done to prevent the documents from being provided under the Colorado Criminal Justice Records Act, which in conjunction with AR 1350-04 required the documents be provided to headquarters of the Colorado Department of Corrections within three days of any such request for their production.

47.   The Report of Investigation and Case Summary Report, dated May 8, 2017, signed by STEGNER and COOPER, shows under "Other Supporting Evidence" "New Charges Pending," indicating that the Parole officers were acting on assurances from the Lakewood Defendants that new criminal charges would be filed and they need not worry about the legal basis of the Parole Officer's actions. It is the practice of the Colorado Board of Parole to continue parole revocation hearings, often with parolees continued in custody without bond, while new criminal charges are pending in the courts.

48.    By an undated ex-parte submission to Colorado Board of Parole Administrative Hearing Officer Tom Waters in late October of 2017, JOE WHITE, revealed that the arrest of April 19, 2017, and the subsequent revocation complaint were to assist LAKEWOOD Defendants in charging CAPPELLI with an arson for which they had no probable cause. WHITE wrote,

> Parolee Jason Cappelli was arrested in April of 2017. At that time our office had a good faith reason to believe that Cappelli would be charged with arson for a fire he set in Lakewood. We proceeded with the revocation hearing based on a stun gun / taser that was recovered during the arrest, and the revelation that the residence had video surveillance equipment installed. At the revocation hearing it was also revealed by sponsor Vincent Todd that he had a concealed weapons permit, "but kept the weapon at another location."

49.    Upon being booked into the Jefferson County Jail CAPPELLI was assessed a $30.00 booking fee under § 30-1-104(n), COLORADO REVISED STATUTES 2016, which was charged against funds placed on his books by TODD.

50.    Although the facts known to Community Parole Officers MATTHEW JAMES STEGNER and SHEFALI PHILLIPS and communicated to JIM COOPER and JOE WHITE, were insufficient to support the charge of possession of a weapon, JIM COOPER, apparently at the direction of JOE WHITE, authorized the filing of a parole revocation complaint in order to unlawfully hold CAPPELLI in jail. SHEFALI PHILLIPS knowingly made a false entry in the CWISE system indicating that the

items seized were in "various parts of the residence accessible to the offend" (sic); however, she was present in the living room at The Residence, along with Defendant TORSAK, when the seizure of the stun gun from the master bedroom was discussed and both were present when MATTHEW JAMES STEGNER ordered TODD to provide him with the access code to unlock the master bedroom.

51.    By April of 2017, any reasonably competent police officer of Community Parole Officer in Colorado would know that possession of a weapon is not proved by the presence of the weapon in a shared residence; rather possession requires either,

   A. a person has direct physical control over a thing; or,

   B. a person, though lacking such physical custody, still has the power and intent to exercise control over the object.

*See, Henderson v. United States, supra.*

52.    In the CWISE entry for April 17, 2017, while noting the video doorbell, no statement is made indicating that this is viewed as a violation or an officer safety issue. Likewise, as provided in response to a Colorado Criminal Justice Records Act request, the original Parole Revocation Complaint does not list the SkyBell HD as a violation of any Parole condition or an "Officer Safety" issue.

After Cappelli's attorney entered an appearance in the Parole Revocation case on May 5, 2017, (upon which a complaint had not been served and the Department of Corrections had been unable to produce under a Colorado Criminal Justice Records Act request) informing the Colorado State Board of Parole that CAPPELLI would be presenting audio and video evidence, it appears that the Department of Corrections employees decided, as evidenced by the Amended Parole Revocation Complaint, that a video doorbell raised "officer safety" concerns.

53.     At hearing on May 17, 2017, with no explanation as to what had changed between April 17, 2017, when STEGNER entered The Residence with one other Community Parole Officer, and April 19, 2017, STEGNER testified,

> Q (By Ms. Johnson) Now, you had visited Mr. Cappelli's home two days previously. Is that correct?
> A One moment. (Pause)
> A Yes.
> Q And you did not search the home at that time. Is that correct?
> A Not at that time. That is correct.
> Q So you returned two days later with a large number of police officers to search the home, correct?
> A Correct. It's random, per our policies of officer safety.
> Q So it is your standard practice, when you search a parolee's home, to take ten officers?
> A If it is an officer safety concern, yes.
> Q And what made it an officer safety concern?
> A The offender's history.

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 17:9-17:25).

54.     On May 17, 2017, CAPPELLI's case arising from the April 19, 2017 arrest, came on for hearing on the merits of the Amended Parole Revocation Complaint before Colorado Parole Board, Board member Brandon Marshall, presiding. The hearing took the testimony of MATTHEW JAMES STEGNER and of Plaintiffs CAPPELLI and TODD. SHEFALI PHILLIPS was present through the audio conferencing link for the entire hearing. During the hearing MATTHEW JAMES STEGNER provided false testimony, inconsistent with the Parole ARs, claiming that all conditions of the Intensive Supervision Parole continued after the 180 days, except for the discontinuation of GPS monitoring.

> THE BOARD: So, Officer Stegner, my question to you is I need you to help me understand how an ISP listed of directives would still apply to someone not on ISP.
>
> THE WITNESS: It's just a matter of a move in a staffing to take him off ISP. The directives are the same while they are on parole. There is no difference between ISP, other than they are not on an ankle monitor, and they are not maintaining equipment of the ankle monitor -- or for it. That is the only difference between ISP and regular. The directives remain the same throughout supervision.
>
> THE BOARD: So are these directives that I'm looking at -- are they signed by everybody on parole, or just people who are on ISP? In other words, is there another packet that does not specify ISP?
>
> THE WITNESS: So when people start out on ISP, this is the packet they sign, which pertains to them when they continue off ISP.

They're still under supervision of Parole, and it is the exact same directives. It just does no -- no longer are they on GPS monitoring or on a cellular unit.

THE BOARD: So if someone was to come off of --

THE WITNESS: That's the (inaudible) their time on ISP.

THE BOARD: If someone started parole not on ISP, what would they sign?

THE WITNESS: It's the exact same packet without the ISP additions, which would be the maintaining of the electronic monitoring equipment.

THE BOARD: What would the -- the cover page of the 24 packet for someone not on ISP -- what would it say at the top?

What would it be titled?

THE WITNESS: It says "Parole IOV Directives."

THE BOARD: Okay, thank you. Ms. Johnson, go ahead.

THE WITNESS: They are -- they are verbatim to the ISP directives.

Q (By Ms. Johnson) Then, in that case, I would ask where on the document signed 9/13/16 he is prohibited from -- or Mr. Todd, specifically, is prohibited from installing a video doorbell?

A If he is residing at the residence, he is to follow the directives.

Q Point me to the specific directive that prohibits the installation of the video doorbell?

A Anywhere a parolee resides, these directives are pertinent.

Q Point me to that directive, please? That Mr. Cappelli signed and/or Mr. Todd signed.

A Number 27, as I previously stated.

(Testimony of MATTHEW JAMES STEGNER, May 17, 2017, Parole hearing 201885A, 30:22-32:18). In fact, the condition 27 referred to by MATTHEW JAMES STEGNER is from the Intensive Supervision Parole conditions, as authorized under AR 250-22, and contained on Form AR 250-22A). CAPPELLI'S standard conditions, as initially ordered by the Parole Board and agreed to by CAPPELLI on December 12, 2015,

and restated on September 3, 2016, authorized the Intensive Supervision Parole conditions for a maximum period of 180 days (or until June 19, 2016). Nothing authorized additional ISP provisions beyond 180 days from CAPPELLI's mandatory release on December 22, 2015.

55.    At the conclusion of the hearing, the Board found CAPPELLI was not guilty on both charges, as there was not a preponderance of the evidence to establish a violation of parole as to either charge.   Although granted a right to appeal under § 17-2-201(9)(d), COLORADO REVISED STATUTES 2016, neither the district attorney for the First Judicial District, nor the Division of Adult Parole, through the Attorney General of Colorado, appealed the acquittal.

56.    MATTHEW JAMES STEGNER, after repeatedly interrupting the Parole Board Member during the hearing and in his findings, was directed to be silent until after the findings were concluded, at which point he would be permitted to make whatever statement he desired. At the conclusion of the findings, acquitting CAPPELLI, SHEFALI PHILLIPS announced that Community Parole Officer MATTHEW JAMES STEGNER had left the room and was not present to make any further record, stating:

[THE BOARD] So ultimately, both conditions have been found not guilty, and Mr. Cappelli will be continued on parole from here forward.

So, Officer Stegner, what did you want to say at this point?

OFFICER PHILLIPS: Mr. Mathews, this is Officer Phillips. Officer Stegner has stepped away. I believe that he just wanted the additional condition number 20 placed on the record, which specifically states "You shall actively participate in your supervision plan, which may be changed from time to time upon personal notification."

And Mr. Stegner advised that he had personally notified him that the only parts that did no longer pertain was the GPS portions of the IOV directives. So, unfortunately, that's a matter of your interpretation. However, that does specifically state –

THE BOARD: So –

OFFICER PHILLIPS: -- that they will -- they can be changed.

(May 17, 2017, Parole hearing 201885A, 56:4-21). The referenced paragraph 20 is from the Intensive Supervision Parole conditions which, by the terms of CAPPELLI's Parole, expired not later than June 19, 2016.

57.     Despite CAPPELLI being acquitted, MATTHEW JAMES STEGNER delayed advising the Jefferson County Jail that CAPPELLI'S release had been ordered as he had been acquitted, and entered the findings into the CWISE system without detailing that CAPPELLI had been acquitted, intending that his supervision read the report as "convicted but returned to parole." MATTHEW JAMES STEGNER 'S CWISE entry reported, "Hearing was conducted and offender was continued on parole by Colorado Parole Board member Brandon Matthews regardless of concerns and objections related to the offenders serious public safety risk." Notwithstanding that

fact, Adult Parole was provided with a copy of the written decision of the Parole Board which was received by MATTHEW JAMES STEGNER on May 18, 2017.

58.    The authority of Community Parole Officer and the Division of Adult Parole is limited with respect to change in a parole plan and parole conditions. The limitations are specifically spelled out in AR 250-37. Without Parole Board approval, the Division may only clarify or enforce existing conditions as explained in AR 250-37(IV)(B), which provides,

> B. Written Directives: A CPO shall issue written parole directives of an on-going nature, at any time during the period of parole, for the purpose of clarifying or enforcing existing parole conditions.
> 1. The CPO shall complete the written directive form (see AR 250-51, Office Visits and Intake Packets, Attachment "A") describing the directive.
> 2. The parolee shall be given a copy and sign acknowledging receipt.
> 3. Examples may include, but are not limited to:
> a. Directing a parolee to attend a particular drug and alcohol or outpatient treatment program.
> b. Clarifying the geographic boundaries of the area to which he/she is paroled.

AR 250-37, IV(B). In order to modify parole conditions when no violation of parole has been proven, Parole Board approval is required.

<u>D. Requesting Regressive Modification of a Parole Condition When a Violation Has Not Occurred</u>

      1. The CPO shall review a request for modification of a parole condition with the supervisor when:

      a. The parolee has not committed any new violations, but new information is discovered by the CPO that was not available to the parole board.

      b. The residence/employment status of a parolee has changed and the change affects public safety (e.g., a homeless parolee being placed in a community corrections center as a condition of parole).

      2. If a modification of a parole condition is deemed appropriate, the CPO shall draft a letter to the Colorado Board of Parole indicating a need for increased supervision. The letter shall be signed by the CPO and submitted to the supervisor and manager for approval/signature. If the letter is approved/signed by the supervisor and manager, the CPO shall forward it to the parole board.

      3. The parole board shall approve or deny the requested modification for increased supervision and notify the CPO of their decision. The CPO shall maintain a copy in the working file.

      4. The parolee shall be given a copy of the modification and directive (Attachment "B"), which he/she signs acknowledging receipt and that he/she understands the modification.

AR 250-37, IV(D).

      59.   On TODD's demand of May 17, 2017, pursuant to AR 250-57, for return of the property taken by Adult Parole from the residence on April 19, 2017, JIM COOPER responded on May 19, 2017, that TODD could pick up the property between 8:00 a.m. and noon on Tuesday, May 23, 2017, from the Englewood Parole Office. In picking up the seized property TODD learned that the iPhone and been searched and imaged without a search warrant.

60.    Following CAPPELLI's acquittal by the Parole Board, in continuance of their conspiracy, and in retaliation for CAPPELLI going to hearing and establishing the unlawful conduct of Defendants, JOE WHITE, MATTHEW JAMES STEGNER, SHEFALI PHILLIPS, and JIM COOPER, caused to be entered, or entered, an order to CAPPELLI requiring that he immediately report upon release from the Jefferson County Jail, after 2:40 PM on May 18, 2017, in a snowstorm, to the Community Parole Office in Englewood. They did this notwithstanding the fact that Community Parole Officer MELISSA LAWRENCE, who had contact with CAPPELLI in connection with the parole revocation, was in fact headed to the Jefferson County Jail, and made contact with CAPPELLI at the jail, as CAPPELLI was waiting for a ride to take him to the Englewood Parole Office.

61.    At the Englewood parole office CAPPELLI was served with a copy of a "Directive/Lawful Order," by WESLEY TRISSEL, apparently at the direction of JOE WHITE, which included the order "You must reside every night at your residence of record as stipulated by the Division of Adult Parole. This excludes prior residence of record, 12608 West 1st Place, Lakewood, CO 80228." All named Parole employees knew, at the time of their actions herein, that pursuant to AR 250-37 no such directive could lawfully issue without the approval of the Parole Board, and no such approval had been sought. Additionally, the law was clearly established

under *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042, 29 A.L.R. 1446 (1923), that an individual has a right to establish a home. The Parole Board having approved that home in the Parole Plan under which CAPPELLI was released on Mandatory Parole, and AR 250-37 requiring Parole Board approval for modification to the Parole Plan, CAPPELLI had a liberty interest in his residence which could not be abridged without notice and an opportunity for hearing. Additionally, the Parole Plan makes it clear, except for actions approved by the Parole Board, that the residence of record cannot be changed without the consent of the Parolee.

> 2. Residence: Parolee shall establish a residence of record and shall reside at such residence in fact and on record; shall remain at the residence of record each night unless otherwise authorized by the Community Parole Officer; shall not change his/her place of residence without the consent of his/her Community Parole Officer; and shall not leave the area paroled to or the State paroled to without permission of the Community Parole Officer,

Nothing in the Parole Plan, Colorado statutes, or the Department of Corrections ARs, authorizes Adult Parole, without the consent of the Parolee, or the Order of the Parole Board to alter the Parolee's Residence of Record.

62.   The "Directive/Lawful Order" purportedly rendering CAPPELLI homeless threatened him with revocation of parole if he were to overnight at his

residence as approved by the Parole Board. The Order was issued in retaliation for CAPPELLI asserting his legal rights as protected by the First Amendment to the Constitution of the United States and constituted criminal extortion under § 18-3-207, COLORADO REVISED STATUTES 2016. The "Directive/Lawful Order" was calculated to undermine CAPPELLI's mental health and generate the opportunity for a parole revocation complaint for associating with criminals in violation of Standard Parole Condition 6, to wit:

> 6.      Association: Parolee shall not associate with any other person on parole, on probation, or with a criminal record or with any inmate of a correctional facility without the permission of the Community Parole Officer.

63.     WESLEY TRISSEL voiced to CAPPELLI that the order was based upon issue of "officer safety" because of the Sky Bell HD™ and the fact that, while TODD was in compliance with the Parole Sponsor Agreement and the Parole ARs, he is, and was prior to the approval of the Parole Plan, a holder of a permit issued by the Jefferson County Sheriff's Office, pursuant to § 18-2-201, *et seq*., COLORADO REVISED STATUTES, to carry a concealed handgun. No rational basis existed for the order, even if there had been an attempt to provide notice and opportunity for hearing.

64.     JOE WHITE later justified the order by writing, in part:

At that time [referring to Cappelli's acquittal on al charges at the Parole Revocation Hearing on May 17, 2917] I made the decision that Cappelli would not return to Mr. Todd's residence for officer safety reasons. This decision was based on the following information:

    • the video surveillance equipment installed in the residence (see attached photo that Mr. Todd entered into evidence at the last hearing);

    • digital key-pad combination locks on multiple doors to rooms within the house (see attached photo taken by CPO Matthew Stegner);

    • lack of any clarification as to the location of any hand guns owned by Mr. Todd - for which he has a concealed permit;

    • the location of the taser;

    • indications in the diagnostic summary related to the previous assault by Mr. Cappelli on Mr. Todd in a jail visiting room;

I was told that at the revocation hearing, Mr. Todd and Mr. Cappelli were not amenable to the use of a DOC ATP to fill any mental health medications, and wanted to use private doctors. That raised some concerns based on Mr. Cappelli's mental health needs and the need for collaboration on that issue to try and ensure the best possible outcome of Mr. Cappelli's parole.

…

After the April home visit and arrest, several of our staff were served with paperwork indicating the filing of a lawsuit related to the event. While I know a lot of parole sponsors are 'anti-law-enforcement', I think a reasonable person would find the tone of that legal paperwork adversarial in nature. The success of parolees often relies on cooperative and collaborative interactions, both in parole offices and at a parolee's residence. I have concerns related to that collaboration.

It should be noted that at no time while Cappelli was supervised by the Englewood Parole Office did WHITE or the Community Parole Officers he supervised attempt any collaborative communication with TODD.

65.    On May 19, 2017, counsel for Plaintiff CAPPELLI sent a letter by email advising RICK RAEMISCH and MELISSA ROBERTS of the service of the unlawful

"Directive/Lawful Order" and demanding that they appropriately intervene. Said letter included an offer to meet to discuss how CAPPELLI could be supervised by the division in light of the conspiracy of Community Parole Officers to violate both state and federal law in order to violate CAPPELLI's rights and retaliate against him for being able to establish their felonious conduct. RICK RAEMISCH and MELISSA ROBERTS have failed and refused to respond, and failed and refused to countermand the unlawful and criminal orders.

66.    Under the unlawful order, the Division of Adult Parole directed CAPPELLI to overnight at the West 40 Motel, 11100 W. Colfax, Lakewood Colorado, despite the fact that the motel does not have phones in the rooms, and that Parole had not returned CAPPELLI's phone to him, he remained under directives to report by telephone through the CWISE system. The West 40 Motel is used by Parole to house Parolees and CAPPELLI, by virtue of being at the West 40 Motel is at risk of being charged with associating with another person on parole in violation of Condition 6 of his supervision, which states:

> 6. Association: Parolee shall not associate with any other person on parole, on probation, or with a criminal record or with any inmate of a correctional facility without the permission of the Community Parole Officer.

The order requiring that he not overnight at this residence was designed to create a pretext for revoking CAPPELLI's parole, and, contrary to the rehabilitative purposes of parole was designed to exacerbate his panic attacks and paranoia. Additionally, the West 40 Motel, while providing a refrigerator and a small microwave, has no food preparation surfaces in the rooms and no sink outside of the bathroom for food preparation and washing utensils.

67.    In order to transport personal belongings to the West 40 Motel, CAPPELLI borrowed a tote duffel/athletic bag from TODD. Additionally, CAPPELLI borrowed a digital audio recorder and belt case for the digital audio recorder from TODD.

68.    In addition to not providing a telephone in the room (and having no payphone), the West 40 Motel provides no Internet access, and is insufficiently secure for CAPPELLI to have his computer present (even if there were an Internet connection), or to have a stereo or other educational and recreational property present with him.

69.    On May 23, 2017, while CAPPELLI was gone from the motel room during the day, both he and Todd suffered property loss from the motel room, consisting of CAPPELLI's jacket, the borrowed tote duffel, a belt case for a digital

audio recorder, a pair of CAPPELLI's underwear and a pair of CAPPELLI's tube socks. These items were removed, without lawful authority, from CAPPELLI's room at the motel. This loss was not discovered until approximately 11:00 PM that night, upon CAPPELLI's illegally mandated return to the room. It was reported online on May 24, 2017, to the Lakewood Police Department which, on May 25, 2017, required CAPPELLI to be interviewed by phone by Lakewood Police Agent Steven C. Hipwell under Lakewood Police Case Number: 17-020348. Despite significant Lakewood Police Department contact with the West 40 Motel in the course of supporting Division of Adult Parole residence checks at that location, Agent Hipwell's report concludes,

> Jason was given the case number and advised that a report would be made. I attempted contact at the West 40, however the number 303-233-4419 has been disconnected.
> No further information at this time.

The Lakewood Police Department has provided no update on the theft since taking the report. Although required to overnight at the West 40 Motel, Colorado law limits that establishment's liability for the loss of CAPPELLI's property to $200 pursuant to § 12-44-109, COLORADO REVISED STATUTES.

70.    This misconduct by MELISSA ROBERTS, JOE WHITE, JIM COOPER, MATTHEW JAMES STEGNER, SHEFALI PHILLIPS, and WESLEY TRISSEL diverted

resources intended for homeless parolees, in order to retaliate against and harass CAPPELLI and TODD for the exercise of federally protected rights. CAPPELLI was told to apply for Food Stamps and was provided vouchers for the motel and RTD Passes. Although their actions clearly constitute misconduct which is a misappropriation of state funds, management of the Colorado Department of Corrections has failed to appropriately intervene and has essentially endorsed the criminal misconduct.

71. On April 19, 2017, TODD made an online report to the Lakewood Police Department Internal Affairs, with respect to misconduct resulting in his internet server being left disconnected from the Internet, which complaint was acknowledged electronically by the department. Despite the fact that Lakewood Police Department internal affairs policy required that the department, if unable to notify Mr. Todd of a disposition within 30 days, provide him with a status report at 30 days, the Lakewood Police Department did not provide any such status on the internal affairs complaint to Mr. Todd as of filing of this action.

72. On May 25, 2017, by letter delivered through United States Postal Service Certified Mail number 9407110200883460597718, DAN MCCASKY, Chief of Police, Lakewood Police Department, received by agents for DAN MCCASKY at 9:43 am on May 30, 2017, was informed:

On April 19, 2017, Vincent C. Todd electronically filed a complaint related to a Lakewood Agent disconnecting, and leaving disconnected from the internet, his server, a Macintosh X-Server, which operates Mr. Todd's office web server, mail server and ftp server. This was done during an illegal search of Mr. Todd's and Mr. Cappelli's home by Lakewood police agents and ATF liaison while they allegedly were there to back up Community Parole Officers. To date, contrary to your policies and procedures, Mr. Todd has not been contacted by any assigned investigator or given a status report. This appears to be in direct conflict with 3103(b)(5) of the Policies and Procedures of the Lakewood Police Department.

Despite notice directly to Chief MCCASKY that the complaint was not being acted upon consistent with the policies and procedures of the Lakewood Police Department, the Department made no attempt to update TODD on the status of any investigation until Jun 27, 2017, when Commander Mark Reeves notified Mr. TODD that due to TODD's exercise of his First Amendment Right to petition this Court for redress of grievances, "any police internal affairs investigation into your complaint is in abeyance." Since TODD'S complaint included a claim of a criminal violation, it is unclear whether any investigation into criminal conduct has also been put in abeyance; however, the crime reported is subject to an eighteen (18) month statute of limitations under § 16-5-401(1)(a), COLORADO REVISED STATUTES 2016.  It would appear to be the intent of the City of Lakewood, consistent with the prior judgment against the City for violating Cappelli's Constitutional rights, to preclude any criminal filing against Defendants by refusing to investigate while

Plaintiffs exercise their First Amendment right to petition for redress of grievances in the courts of the United States. This refusal to investigate, although inconsistent with the Lakewood Police Department's written policies, was undertaken with the knowledge and approval of DAN MCCASKY, whose command reaction to his officer's criminal conduct directed against CAPPELLI and TODD amounts to an endorsement the outlaw culture which previously resulted in a jury finding the City of Lakewood liable for civil rights violations against Cappelli in 2000.

73.   On May 25, 2017, by letter delivered through United States Postal Service Certified Mail number 9407110200883460597718, counsel for CAPPELLI made demand of DAN MCCASKY, Chief of Police, Lakewood Police Department, for the return of the property unlawfully seized by the Lakewood Police in the unlawful arrest of CAPPELLI on April 19, 2017. Despite the fact that the said letter was received by agents for DAN MCCASKY at 9:43 am on May 30, 2017, the property has not been returned and no response has been received from Chief DAN MCCASKY.  Again, MCCASKY's conduct is consistent with the policy and practice of the City of Lakewood found in Cappelli's 2000 judgment against the City.

74.   Pursuant to § 30-1-104, COLORADO REVISED STATUTES 2016,

(1) Fees collected by sheriffs shall be as follows:
…

47

(n) For committing and discharging convicted prisoners to and from the county jail, in counties of every class, a reasonable fee, not to exceed thirty dollars, which fee shall be collected directly from prisoners at the time of commitment, but shall be refunded to any prisoner who is not convicted;

Pursuant to this section the Jefferson County Sheriff charges a fee of $30.00 as a

booking fee for anyone booked into his jail; however, his prisoner handbook

informs the prisoners,

BOOKING FEE: Pursuant to §30-1-104, C.R.S. you may be assessed a fee up to $30.00. The fee may be deducted from your personal account or collected at the time of bonding. Unpaid debt for Booking Fees will be carried forward to future Bookings. Partial amounts will be deducted from your account if the total amount due is not available.

Jefferson County Sheriff's Office Detention Facility Inmate Handbook, 2014, p. 22.

No mention is made of the statutorily mandated refund for those not convicted on

the committing offense.

75.     Upon CAPPELLI's release from the Jefferson County Jail in May of

2017, he was provided with an accounting showing that he had been assessed the

entire $19.99 which TODD had placed upon his books for commissary and was

being billed for an additional $10.01 pursuant to § 30-1-104, COLORADO REVISED

STATUTES 2016. At CAPPELLI's counsel's direction, Todd contacted the Jefferson

County Jail on May 19, 2017, to determine the reason for the assessment when

Cappelli was acquitted and was informed that Cappelli would have been provided with a form to see refund of the booking fee when he was released. No such form was provided to Cappelli at his release and the form could not be located on the Jefferson County Sheriff's Office website.

76.     At the direction of Cappelli's Counsel, on May 27, 2017, TODD made a Colorado Criminal Justice Records Act request of the Jefferson County Sheriff's Office for documents relevant to Cappelli's incarceration and release and the assessment of the booking fee. While the Sheriff's Office was, on June 6, 2017, able to produce their Booking Fee Refund Request form, they did not produce any signed version showing that CAPPELLI had been provided with the form. The form directed:

> In order to assist the Sheriffs Office in processing your request, please attach copies of court documents showing that you were acquitted of all charges, or all charges were dropped that were associated with the docket(s) or warrant(s) for this booking. Please make sure that you submit copies, as we will not return any documents to you other than this request indicating approval or disapproval.

Since Cappelli was not provided any documentation from his Community Parole Officer showing that he was acquitted, the form had to be submitted with the Parole mittimus, produced by the Department of Corrections on May 30, 2017, again in response to a Colorado Criminal Justice Records Act request sent by

TODD at the direction of CAPPELLI's Counsel. Thus, in order to obtain the form and the documents necessary to request the refund of the Booking Fee from the Jefferson County Sheriff's Office, it was necessary for CAPPELLI to incur liability for two and one half hours of paralegal time at $312.50 and one half hour of attorney time at $125.00, and incur $5.00 in fees for the Criminal Justice Records Request.

77.   On September 12, 2017, the Division of Adult Parole followed up on their threat to arrest Mr. CAPPELLI if he did not remain at the West 40 Motel, despite it being undisputed that they had not sought the required Parole Board approval for ordering the change of his residence. Additionally they charged a violation for failure to obey a "directive" which had not been reduced to writing as required by the ARs.

78.   Cappelli was arrested without a warrant on September 12, 2017, by MELISSA LAWRENCE, who had notice that neither charge she was lodging against Cappelli was supported by a lawful order under the Administrative Regulations which control the conditions of parole in Colorado.

79.   Upon being lodged into custody of SHRADER on September 12, 2017, $10.00 in cash was taken from Mr. CAPPELLI at the Jefferson County Jail which

was not returned with his property or accounted for any documents provided to Cappelli by the Jefferson County Sheriff's Department.

80.    Cappelli was served with a bare Parole Revocation Complaint, without the Report of Investigation, claiming violation of Parole Directives.  While one was the unlawful order changing Cappelli's residence of record, the other was an alleged violation of a "directive" which was never reduced to writing and identified as a directive as required by the ARs.  As such, Cappelli had no notice that the referral out of county for a mental health provider was an enforceable directive rather than an additional treatment option.

81.    The revocation complaint was filed at the direction of JOE WHITE, knowing that the Complaint and all circumstances surrounding it were a violation of Cappelli's rights to due process of law under the Fourteenth Amendment to the Constitution of the United States.

82.    From September 13, 2017, through October 9, 2017, the Jefferson County Sheriff's Office denied Cappelli his psychiatric medication, despite the fact that they had determined it was a necessary psychiatric medication in his April incarceration.

83.    On October 11, 2017, an Administrative Hearing Officer for the Colorado Board of Parole, failing to address the lawfulness of the directives, found

one count proved, but held the case open, finding that placement of Cappelli at a motel (such as West 40 Motel) was not an appropriate placement and directing Adult Parole to investigate modifications at Cappelli's home, if necessary, to meet Division standards.

84.   Community Parole Supervisor JOE WHITE apparently directed his office not to comply with the order, and in late October sent an *ex parte* communication to the Administrative Hearing Officer, causing a mittimus to issue on October 31, 2017, revoking Cappelli's parole

85.   On November 14, 2017, follow-ups to a Colorado Criminal Justice Records Act request produced the *ex parte* communication by JOE WHITE to the Administrative Hearing Officer, which includes representations that the parole arrest on April 19, 2017, was pursuant to an understanding with the Lakewood Police Department that CAPPELLI would be criminally charged by them.  In the memo Mr. White justifies his actions against CAPPELLI based upon the "adversarial" nature of this lawsuit.

86.   On November 13, 2017, CAPPELLI formally appealed the revocation of his parole to the Colorado State Board of Parole pursuant to § 17-2-103(2)(b), COLORADO REVISED STATUTES 2017. By law, the Board was required to act on the appeal within fifteen working days of the November 13, 2017, filing of the appeal

and was further required to provide written notice of the formal action on the appeal within ten working days of the decision pursuant to § 17-2-201(9)(c), COLORADO REVISED STATUTES 2016.

87.    On November 27, 2017, the Colorado State Board of Parole notified CAPPELLI that he had been returned to parole on an "early turnaround" effective November 28, 2017.  TODD was called to pick CAPPELLI up at 8:00 a.m. on November 28, 2017, from Denver Diagnostic and Reception Center.  The documents CAPPELLI was provided on his release made no reference to the Parole Appeal.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF FOURTH AMENDMENT RIGHTS OF TODD AND CAPPELLI COMMENCING APRIL 19, 2017

88.    Plaintiffs' incorporate the preceding averments of this Complaint into this cause of action as if set forth fully herein.

89.    The conduct of Defendants WILLIAM HOOVER, JIMMY TORSAK, MICHAEL GRIFFITH, JANNA SCHMMELS, and JOHN DOE, related to the search of, and seizure of items from, 12608 WEST 1ST PLACE and their participation in the arrest of JASON ALAN CAPPELLI from that residence, as well as CAPPELLI's continued detention through May 18, 2017, damaged TODD and CAPPELLI by violating TODD and CAPPELLI's rights to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States.

90.    Such conduct is actionable in declaratory relief, damages and punitive damages pursuant to 42 U.S.C. § 1983, along with costs and attorney fees pursuant to 42 U.S.C. § 1988.

Wherefore, Plaintiffs pray for:

A. Declaratory relief, holding that the entry of Defendants WILLIAM HOOVER, JIMMY TORSAK, MICHAEL GRIFFITH, JANNA SCHMMELS, and JOHN DOE into the Residence and their search of The Residence on April 19, 2017, violated CAPPELLI'S Fourth Amendment Rights;

B. Declaratory relief, holding that the entry of Defendants WILLIAM HOOVER, JIMMY TORSAK, MICHAEL GRIFFITH, JANNA SCHMMELS, and JOHN DOE into the Residence and their search of The Residence on April 19, 2017, violated TODD'S Fourth Amendment Rights;

C. Declaratory relief, holding that the arrest of CAPPELLI from The Residence on April 19, 2017, violated CAPPELLI's Fourth Amendment Rights;

D. Judgment in favor of JASON ALAN CAPPELLI for damages, including punitive damages, costs and attorney fees, against each Defendant found

individually liable for violation of CAPPELLI's Fourth Amendment Rights flowing from, or the fruits of, Defendants' actions at The Residence on April 19, 2017.

E. Judgment in favor of VINCENT C. TODD for damages, including punitive damages, costs and attorney fees, against each Defendant found individually liable for violation of TODD's Fourth Amendment Rights flowing from, or the fruits of, Defendants' actions at The Residence on April 19, 2017.

### JURY DEMAND

Plaintiffs demand trial by jury as to all issues so determinable.

Respectfully submitted:

/s/ Nancy C. Johnson
Nancy C. Johnson
P.O. Box 17057
Golden CO 80402
Phone number: 303-231-9343
E-Mail: ncjonson@earthlink.net

Attorney for JASON ALAN CAPPELLI

/s/ VINCENT C. TODD
Vincent C. Todd
12600 W Colfax AVE STE C400
Lakewood CO 80215
Phone number 303-980-0922
E-Mail:
Vincent.todd@coloradowrits.com

*Pro se*